EL PUEBLO DE PUERTO RICO, apelado, *v.* PABLO DUARTE MENDOZA, acusado y apelante.

*Número:* CR-78-83 *Resuelto:* 17 de abril de 1980

*Oscar R. Brizzie*, abogado del apelante; *Héctor A. Colón Cruz, Procurador General*, y *Justo Gorbea Varona, Procurador General Auxiliar*, abogados de El Pueblo.

Opinión emitida por el Juez Asociado Señor Martín exponiendo la Opinión del Tribunal en sus partes I, II, III y IV. (*)

En el quehacer jurídico de nuestros tiempos pocas controversias suelen suscitar problemas tan diversos y escabrosos como aquella que gira en torno del aborto y de su reglamentación por la ley. Resaltan al respecto consideraciones morales, históricas, religiosas y culturales de toda índole cuya armonización fiel en cualquier norma legal es poco menos que imposible. Abriendo brecha entre tan enmadejados contornos, cada sociedad escoge de entre las alternativas posibles aquélla que mejor se ajuste a sus valores y aspiraciones. Se advierte, sin embargo, un constante fluir de argumentos y debates y los resultados observados aun entre los pueblos de marcada tendencia progresista, poco se asemejan.

Así por ejemplo, el escrutinio constitucional condujo en la Alemania Occidental a la anulación de cierto estatuto sobre aborto por carecer el mismo de protección suficiente al embrión; mientras que, por otra parte, en los Estados Unidos de América, el derecho constitucional a la intimidad de que disfruta la mujer embarazada, se estimó en ocasiones capaz de postergar cualquier protección que parezca merecer el ser que de ella se nutre. Resulta, pues, que sobre el tema que nos ocupa no hay tendencia definida que marque un trayecto

---

(*) Los Jueces Asociados Señores Dávila, Torres Rigual y Negrón García se unen a la totalidad de la opinión; el Juez Asociado Señor Irizarry Yunqué a las partes I, II, III y IV.

común entre los pueblos y es muy probable que gracias a la naturaleza del problema, esa tendencia nunca se perfile. [1]

En Puerto Rico, años ha que contamos con legislación que regla lo concerniente al aborto. [2] La naturaleza de dicha reglamentación ha sido eminentemente penal advirtiéndose, no obstante, diferencias marcadas entre las disposiciones de los distintos estatutos que han privado sobre el tema.

Ahora bien, nunca antes habíanse colocado nuestras normas legales sobre el aborto en el tamiz constitucional ante este Tribunal; esto es, nunca antes habíamos enfrentado dicha reglamentación y los valores que ella recoge a los derechos y prerrogativas que disfrutan los puertorriqueños por gracia de las constituciones del Estado Libre Asociado de Puerto Rico y de los Estados Unidos de América. El caso de autos nos ofrece por primera vez la oportunidad de abordar el tema. Repasemos primeramente los pormenores de la controversia.

I

El apelante, médico autorizado a ejercer su profesión en el Estado Libre Asociado, practicó un aborto, el 24 de julio de 1973, a una joven de 16 años que se hallaba en su primer trimestre de embarazo. [3] Hallado culpable del delito de aborto por un panel de jurados y habiéndosele impuesto sentencia suspendida de dos a cuatro años de reclusión ha apelado ante nos alegando principalmente que la sentencia impuéstale es inválida por contravenir la Constitución estadounidense según fuera interpretada por el Tribunal

---

[1] Véase *West German Abortion Decision: A Contrast to Roe v. Wade*, en 9 J. Mar. J. of Prac. & Proc. 551 (1975).

[2] Con anterioridad a 1902, nuestro Código. Penal de 1879 proveniente del español de 1870, regulaba el aborto en su Título VIII, Cap. VI, Arts. 423–426. M. Ochotorena, *Código Penal Para las Islas de Cuba y Puerto Rico, anotado con la jurisprudencia del Tribunal Supremo,* Madrid. 1894. págs. 432–434. Su rigor. sin embargo, era mayor al vigente y a la Ley Núm. 136 de 15 de mayo de 1937.

[3] La propia prueba de cargo fundamenta este hecho toda vez que de ella surge que la última menstruación de la joven fue para el 7 de mayo de 1973.

Supremo federal en los casos señeros de *Roe* v. *Wade*, 410 U.S. 113 (1973), y *Doe* v. *Bolton*, 410 U.S. 179 (1973).

El Estado por su parte sostiene que toda disquisición en torno a la doctrina constitucional relacionada con el aborto huelga en el caso de autos en el que el médico acusado no demostró que la menor en quien se practicó el aborto pudiera prestar un consentimiento cabal a la intervención en ausencia del asentimiento de los padres. Argumenta, por tanto, el Ministerio Público que la convicción del apelante es procedente independientemente de cualquier determinación constitucional por la peculiar circunstancia de la minoridad de la mujer intervenida.

Sobre tales contenciones ha quedado la controversia debidamente argumentada y lista para su final resolución. Veamos.

## II

█ No puede albergarse duda en torno a la aplicabilidad en Puerto Rico de la norma jurisprudencial del Tribunal Supremo de los Estados Unidos relativa al problema del aborto. En *Roe* v. *Wade*, supra, se reconoció que el derecho a la intimidad es suficientemente amplio para incluir la decisión de la mujer para terminar su embarazo. Este derecho tiene su base en el concepto de libertad personal protegido por las cláusulas de debido procedimiento de ley de las enmiendas quinta y decimocuarta de la Constitución federal y ha sido calificado como fundamental por el Tribunal Supremo de los Estados Unidos, [4] 410 U.S. a las págs. 152 y 153. Como tal, resulta aplicable a Puerto Rico. [5] *Califano* v. *Gautier*

---

[4] Véase, L. Henkin, *Privacy and Autonomy*, 74 Colum. L. Rev. 1410 (1974).

[5] En nuestra jurisdicción el concepto de intimidad del ser humano tiene raíz constitucional expresa. La Constitución del Estado Libre Asociado de Puerto Rico en su Art. II, Sec. 8, dispone: "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Nuestra Ley Básica adopta en esa expresión una apreciación humana fundamental de protección de la dignidad del hombre, esencial para la vida misma. Ese concepto, recogido en la Declaración Universal de Derechos Humanos, es, sin duda, de

*Torres,* 435 U.S. 1, n. 4 (1978), *Ex. Bd. of Eng., Arch. and Sur.* v. *Flores de Otero,* 426 U.S. 572, 599–601 (1976), *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U.S. 663, 679–80, n. 14 (1974). Tal como dijéramos en *Aponte Martínez* v. *Lugo,* 100 D.P.R. 282, 287 (1971), "sería iluso pensar que el Tribunal Supremo de los Estados Unidos no insistiría en que se protegiesen en Puerto Rico los derechos constitucionales fundamentales de los ciudadanos de los Estados Unidos". Así, pues, nuestra tarea consiste en delinear con la mayor precisión posible la doctrina que se ha esbozado en la jurisprudencia federal con respecto a este tema para someter luego nuestro estatuto a su rigor y determinar si el mismo está en armonía con la norma constitucional proclamada en dicha jurisprudencia. Analicemos a continuación los casos federales que rigen la materia.

## III

Tres opiniones del Tribunal Supremo de los Estados Unidos son particularmente importantes para la solución de la controversia de autos. Son ellas las emitidas en los casos de *United States* v. *Vuitch,* 402 U.S. 62 (1971); *Roe* v. *Wade,* 410 U.S. 113 (1973) y *Doe* v. *Bolton,* 410 U.S. 179 (1973), mereciendo particular atención esta última que no es sino la fusión armónica de las dos anteriores.

1. *United States* v. *Vuitch, 402 U.S. 62 (1971)*

En aquel caso tratábase de la impugnación constitucional del estatuto sobre abortos del Distrito de Columbia que en su parte pertinente disponía:

---

supremo rango en la jerarquía de valores de nuestra sociedad. J. J. Santa-Pinter, *Los Derechos Civiles en Puerto Rico,* 1973, págs. 12–14, Río Piedras. Véanse *E.L.A.* v. *Hermandad de Empleados,* 104 D.P.R. 436 (1975); *Cortés Portalatín* v. *Hau Colón,* 103 D.P.R. 734 (1975); *Alberio Quiñones* v. *E.L.A.,* 90 D.P.R. 812 (1964). No obstante, en materia de aborto, advertimos que la extensión de las protecciones que brinda nuestra Constitución no es mayor a la que brinda la norteamericana; por tanto, sólo nos referimos a ésta.

"Quienquiera que, por medio de cualquier instrumento, medicamento, droga u otro medio cualquiera, procure o produzca, o intente procurar o producir un aborto o malparto en cualquier mujer, a menos que el mismo fuera necesario *para la preservación de la vida o salud de la madre* y bajo la dirección de un médico competente y autorizado, será recluido en penitenciaría no menos de un año ni más de diez años." (Énfasis suplido.)

En aquella ocasión el Tribunal Supremo descartó un argumento que proponía la inconstitucionalidad del citado estatuto a base de que el término "salud" utilizado en el mismo era tan incierto e impreciso que no advertía adecuadamente la situación que pretendía cubrir, vaguedad intolerable, según se argumentaba, ante el derecho a un debido procedimiento de ley. Por voz del Juez Asociado Señor Hugo Black, el Tribunal determinó que la voz "salud" debía interpretarse como descriptiva tanto de una condición física saludable como de un estado de bienestar sicológico y mental. 402 U.S. a las págs. 71–73. Por tal razón, se sostuvo en la opinión que no presentaba problema constitucional el estatuto allí analizado ya que su lenguaje sólo exigía de los médicos como condición para el aborto, la clásica, común y cotidiana determinación sobre conveniencia fisiológica o mental que se requiere por ser principio básico de medicina para cualquier intervención médica. 402 U.S. a la pág. 72.

2. *Roe* v. *Wade, 410 U.S. 113 (1973)*

*Roe* v. *Wade*, supra, resuelto simultáneamente con *Doe* v. *Bolton*, supra, es la opinión que contiene el núcleo de la doctrina federal sobre el tema del aborto. Estaba ante la consideración del Tribunal Supremo federal un estatuto criminal del estado de Texas que prohibía el aborto excepto aquél "procurado o intentado por consejo médico *con el propósito de salvar la vida de la madre*". Véanse Arts. 1191–1194 y 1196 del Código Penal de Texas (énfasis suplido). Se establece en dicha opinión el balance que debe imperar entre los intereses del Estado en la consecución de la salud comunal, el mantenimiento de la mejor práctica médica y en la protección del *nasciturus*, y el derecho a la privacidad que a

la mujer le garantiza la Constitución de los Estados Unidos de América. 410 U.S. 152 *et seq.* A tales fines se reconoció que el derecho a la intimidad de que disfruta la mujer incluye su decisión con respecto al aborto, derecho que queda limitado por los legítimos intereses del Estado, los cuales son de distinta naturaleza en las varias etapas del embarazo. Tales intereses son: (1) el de preservar y proteger la salud de la mujer encinta, y (2) el de proteger la potencialidad de la vida humana, los cuales son separados y distintos. 410 U.S. a la pág. 162. Para establecer las distintas posibilidades de reglamentación compatibles con la Constitución federal, el Tribunal hubo de dividir el período normal de embarazo de la mujer en tres trimestres susceptibles de diferente regulación de ley:

A. En cuanto al primer trimestre consideró que el interés importante y legítimo del Estado respecto a la salud de la madre no alcanza su preponderancia hasta aproximadamente al final del primer trimestre. Consiguientemente reconoció que el médico que atiende a la mujer embarazada queda en libertad durante ese trimestre de hacer la determinación de terminar el embarazo, en consulta con ella, y usando su juicio médico sin la intervención del Estado. 410 U.S. a la pág. 163. Esto es, la mujer no necesita la anuencia del Estado pero sí un médico que apruebe su decisión. Véase L. H. Tribe, *The Supreme Court 1972 Term, Foreword: Toward a Model of Roles in the Due Process of Life and Law,* 87 Harv. L. Rev. 1, 11 (1973).

B. Pasado el punto en que el Estado adquiere interés preponderante, o sea, durante el segundo trimestre del embarazo, el Estado puede, en su legítimo interés en la protección y preservación de la salud materna, reglamentar el procedimiento de aborto siempre y cuando que la regulación tenga una relación razonable con tal propósito. 410 U.S. a las págs. 163–164.

C. En la etapa del último trimestre de preñez, en la que se reconoce interés del Estado en la protección de la potenciali-

dad de vida humana, puede regularse y hasta prohibirse el aborto excepto cuando fuere necesario para la protección de la salud o vida de la madre. 410 U.S. a las págs. 163–164.

A tenor con los principios expuestos el Tribunal Supremo federal resolvió que el restringir los abortos legales a aquellos procurados o intentados por prescripción médica con el propósito de *salvar la vida de la madre,* sin que se establezcan distinciones entre abortos procurados en los principios de la preñez y aquellos procurados avanzada la misma, y sin reconocer otros intereses envueltos, no puede sostenerse constitucionalmente a la luz de la Enmienda Catorce. 410 U.S. a las págs. 117–118 y 164.

3. *Doe* v. *Bolton, 410 U.S. 179 (1973)*

*Doe* v. *Bolton,* supra, y *Roe* v. *Wade,* 410 U.S. 113 (1973), deben considerarse conjuntamente, según requiere expresamente el propio Tribunal Supremo. 410 U.S. a la pág. 165. Y es ello así toda vez que en *Bolton* se enfrentan las normas constitucionales proclamadas en *Wade* a un estatuto de diseño más moderno; enfrentamiento que sirve para perfilar las modalidades operacionales de la doctrina establecida, a la vez que se armoniza dicha doctrina con otros principios jurisprudenciales pertinentes. *Id.,* 410 U.S. a las págs. 181–182.

Se trataba en *Bolton,* supra, de los Arts. 16-1201 a 1203 del Código Penal del estado de Georgia que tipificaban en aquella jurisdicción el delito de aborto. Como excepción, sin embargo, no se consideraba criminal un aborto que efectuara un médico debidamente autorizado para ejercer la medicina y la cirugía en Georgia cuando a tenor con su mejor juicio clínico el aborto era necesario porque:

"(1) la continuación de la preñez haría peligrar la vida de la mujer o *seria y permanentemente* lesionaría su salud; o

(2) muy probablemente el feto nacería con grave, permanente e irremediable defecto mental o físico; o

(3) el embarazo resultaba de una violación técnica o forzosa." (Énfasis suplido.)

Al igual que en *Wade* y que en el caso de autos, en *Bolton* la impugnación constitucional se hacía por una mujer en su

primer trimestre de embarazo. El Tribunal Supremo federal sostuvo al tribunal de distrito federal ($^6$) que declaró contrarias a la Constitución aquellas cláusulas del estatuto de Georgia que limitaban el aborto legal a las tres situaciones reseñadas precedentemente. Entendió el tribunal que el médico no debía estar atado a dichas tres condiciones sino que podía ejercer su criterio en la forma más amplia que aconseja su juicio clínico. Quedó, pues, como excepción constitucionalmente válida al delito de aborto el efectuado por un médico debidamente autorizado a ejercer la medicina y la cirugía en Georgia si luego de usar su mejor juicio clínico considera que el aborto es necesario. ($^7$) 410 U.S. a las págs. 186, 192. Debe advertirse que la primera de las excepciones que fue anulada, que se refería a la salud de la mujer, se consideró muy estricta al requerir una determinación de que su salud sería afectada *seria y permanentemente.* ($^8$)

($^6$) Tribunal de Distrito para el Distrito norteño de Georgia. Véase 319 F.Supp. 1048 (N.D.Ga. 1970).

($^7$) Incide la opinión concurrente y disidente del Señor Juez Presidente al declarar que en *Bolton* sólo se consideraron aspectos procesales del estatuto de Georgia. Dijo el Tribunal Supremo estadounidense:

"Los apelantes atacan sobre deficientes bases *aquellas partes de los estatutos de aborto de Georgia que subsistieron después de la decisión de la Corte de Distrito;* indebida restricción a su derecho de intimidad personal y marital, vaguedad. . . ." 410 U.S. a la pág. 189. (Énfasis nuestro.)

Así pues, la opinión concurrente y disidente del Juez Presidente sólo considera la parte IV D del caso *Bolton* y omite las I, II, III y IV A, B y C. Dicha opinión induce a error (véase su escolio número 7) puesto que descansa en la aseveración cierta de que las partes del estatuto de Georgia que fueron declaradas inconstitucionales en el Tribunal de Distrito no estaban ante la consideración del Tribunal Supremo. No obstante, lo fundamental es tener presente que nuestro estatuto es similar a las partes del estatuto de Georgia *que no fueron declaradas inconstitucionales por el Tribunal de Distrito.* Esas partes fueron sometidas al escrutinio constitucional del Tribunal Supremo en *Bolton* y fueron consideradas válidas.

($^8$) En *Bolton* se anuló, además, el requisito impuesto por la ley de Georgia de que el aborto debía hacerse en un hospital autorizado y acreditado en cierta forma y con la aprobación de un comité de médicos sujeto a ciertos criterios. La razón para la nulidad encuentra apoyo en *Wade* ya que el requisito hospitalario del estatuto de Georgia no excluía el primer trimestre. *Id.* 195. Reconoció, sin embargo, el Tribunal que tales requisitos hospitalarios podían adoptarse por el Estado para el período posterior al primer trimestre siempre y cuando fueren estándares legítimamente relacionados al objetivo que el Estado persigue. *Id.* 194–195. El tribunal sostuvo, sin embargo, el requisito estatutario de Georgia que exigía que la determinación médica se redujera a escrito. *Id.* 203.

Invocando su decisión en *United States* v. *Vuitch*, 402 U.S. 62 (1971), que he resumido antes, el alto Tribunal rechazó el argumento de que las palabras del estatuto de Georgia que exigían el "juicio clínico" del médico y su consiguiente determinación de que el aborto era "necesario" eran vagas e imprecisas, y afirmativamente expresó que tal determinación médica sobre salud física o mental, no es distinta a la que hacen los galenos en todo caso en que intervienen. 410 U.S. a las págs. 191–192. El Tribunal hizo hincapié, sin embargo, en que el requerido juicio médico habrá de ejercitarse "a la luz de todos los factores—físicos, emocionales, psicológicos, familiares, y la edad de la mujer—pertinentes al bienestar de la paciente", por estar ellos relacionados con la salud, y por entender que criterio tan amplio opera para beneficio y no para perjuicio de la mujer. *Id.*

Así, pues, al integrarse en el caso *Bolton* las decisiones de *Wade* y *Vuitch*, se colige con claridad que, en el primer trimestre de embarazo, la decisión sobre el aborto debe descansar en el mejor juicio clínico del médico a cargo, juicio que como en cualquier caso, descansa a su vez sobre consideraciones de salud física o mental de la paciente. B. B. Sendor, *Medical Responsibility for Fetal Survival Under Roe and Doe*, 10 Harv. Civ. Rights Civ. Lib. L. Rev. 444, 447, n. 19 (1975).

Nuestra tarea próxima se reduce entonces a determinar si nuestro estatuto se ajusta a esa norma para el primer trimestre de embarazo.

## IV

El Art. 266 del ya derogado Código Penal de 1937 disponía:

"Toda persona que proporcionare, facilitare, administrare o hiciere tomar a una mujer cualquier medicina, droga, o sustancia, o que utilizare o empleare cualquier instrumento u otro medio, con intención de hacerla abortar, *excepto el caso de que fuere necesario para salvar su vida*, y toda persona que ayudare a la comisión de

cualquiera de dichos actos incurrirá en pena de presidio por un término de dos a cinco años." (Énfasis suplido.)

Comoquiera que la única excepción que reconocía el estatuto era la de salvar la vida de la embarazada, prontamente se amplió la exclusión para añadir "la conservación de la salud o vida", perdiendo el Art. 266 toda eficacia normativa al menos sobre casos como el de autos. ([9]) El nuevo estatuto dispuso como sigue:

"Por la presente se prohíbe, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico *con vista a la conservación de la salud o vida*, el indicar, aconsejar o inducir a abortar o practicar el aborto en una mujer embarazada." Ley Núm. 136 de 15 de mayo de 1937, Sec. 1, 33 L.P.R.A. sec. 1051. (Énfasis suplido.)

Esta última disposición legal priva sobre la controversia de autos ya que los hechos ocurrieron durante su vigencia y antes de entrar en vigor el actual Código Penal de 1974. No obstante, comoquiera que el Código actual mantiene sobre el asunto del aborto un rigor similar a la Ley Núm. 136, *supra*, nuestras expresiones sobre la constitucionalidad del Art. 1 de la Ley Núm. 136, *supra*, han de ser cardinales para la interpretación del Código ahora vigente. ([10])

---

([9]) Nótese que la Sec. 7 de la Ley Núm. 136 derogó toda ley o parte de ley que se opusiera o estuviera en conflicto con la misma. En abierto choque con la Ley Núm. 136 se hallaba desde luego, aquella parte del Art. 266 del Código Penal que no permitía la práctica del aborto en aras de la salud de la madre. Por tanto, opera plenamente el Art. 1 de la Ley Núm. 136 comoquiera que su tratamiento de la exclusión de responsabilidad es más amplio. La enmienda peculiar que se hizo al Art. 266 en 1964 en nada afectó esta realidad. No podía, pues, concebirse, al menos en casos como el de autos, una acusación por violación al Art. 266 del Código Penal de 1937 luego de los cambios de los elementos del delito de provocar un aborto por disposición de la Ley Núm. 136.

([10]) El Art. 91 del Código Penal de 1974, 33 L.P.R.A. sec. 4010, dispone:

"Toda persona que permita, indique, aconseje, induzca o practique un aborto, toda persona que proporcionare, facilitare, administrare, prescribiere o hiciere tomar a una mujer embarazada cualquier medicina, droga, o sustancia o que utilizare o empleare cualquier instrumento u otro medio con intención de hacerla abortar, y toda persona que ayudare a la comisión de cualquiera de dichos actos, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico, *con vista a la conservación de la salud o vida de la madre*, será sancionada con pena de reclusión por un término mínimo de dos años y máximo de cinco años." (Énfasis suplido.)

 Según queda dicho, el estatuto criminal sobre abortos de Puerto Rico exime de responsabilidad penal todo aborto prescrito por un médico, dirigido a la "conservación de la salud o vida" de la embarazada. Interpretado correctamente, el término "salud" contenido en nuestro estatuto, implica tanto salud física como salud mental. (¹¹) En ese sentido enfrentamos una situación similar a la considerada en *United States* v. *Vuitch*, supra, y en *Doe* v. *Bolton*, supra. Los referidos estatutos criminales sobre el delito de aborto en Puerto Rico son en todo sentido similares a aquél que recibió la anuencia constitucional del Tribunal Supremo de los Estados Unidos en *United States* v. *Vuitch*, supra, y similar también al estatuto cuya validez fue sostenida en *Doe* v. *Bolton*, supra, luego de los ajustes de que fuera objeto en el tribunal federal de distrito en el que se originó el caso. (¹²)

(¹¹) Véase, entre otros, el *Diccionario Terminológico de Ciencias Médicas* que a la pág. 1065 define el concepto "salud" como aquel "estado normal de las funciones orgánicas *e intelectuales*". (Énfasis suplido.) 8va ed., Barcelona, 1963.

(¹²) Sin embargo, la opinión concurrente del Señor Juez Presidente niega el estricto *ratio decidendi* de *Bolton* y su aplicación al caso de autos. Para ello, no obstante, invoca autoridades que en nada le favorecen. Así, por ejemplo, en *People* v. *Frey*, 294 N.E.2d 257 (1973), se trataba del estatuto de Illinois que sólo excluía de penalidad el aborto dirigido a preservar la vida de la madre. Igualmente en *State* v. *Munson*, 206 N.W.2d 434 (1973), con respecto al estatuto de Dakota del Sur. Véase *State* v. *Munson*, 201 N.W.2d 123 (1972). En *State* v. *Lawrence*, 198 S.E.2d 253 (1973), de un estatuto que no reconocía en su tipificación delictual excepción alguna a favor de médicos. *Hodgson* v. *Lawson*, 542 F.2d 1350 (8th Cir. 1976), trataba de la impugnación de ciertos requisitos que no están contenidos en nuestro estatuto. En *Larkin* v. *McCann*, 368 F.Supp. 1352 (E.D. Wis. 1974), se aceptó por el Procurador General de Wisconsin la inconstitucionalidad de un estatuto que en nada se parecía al nuestro. El estatuto de Connecticut impugnado en *Abele* v. *Markle*, 369 F.Supp. 807 (D. Conn. 1973), prohibía todo aborto que no fuera necesario para preservar la *vida física* de la madre. En *State* v. *Norflett*, 337 A.2d 609 (1975), se trataba de un aborto provocado por una mujer que no era médica. *Mahoning Women's Ctr.* v. *Hunter*, 444 F.Supp. 12 (N.D. Ohio, E.D. 1977), declaró inconstitucionales los requisitos que debía reunir la institución en que se practicara el aborto, por exceder los permitidos a la luz de *Wade* y *Bolton.* Igualmente ocurrió en *Arnold* v. *Sendak*, 416 F.Supp. 22 (S.D. Ind. 1976). En *Hodgson* v. *Anderson*, 378 F.Supp. 1008 (D. Minn. 1974), se trataba de unas extensas disposiciones estatutarias del estado de Minnesota, que no tenían similaridad a las validadas en *Bolton* ni por consiguiente a las que hemos validado en esta opinión. Finalmente, en *People* v. *Norton*, 507 P.2d 862 (1973), se trataba del estatuto de Colorado que, distinto al nuestro, y similar a la porción de aquél del estado de Georgia declarado inconstitucional por el tribunal de distrito en *Bolton,* condicionaba la realización legítima del aborto a que fuera

Puede afirmarse que la disposición estatutaria nuestra se cuenta entre los estatutos sobre aborto más liberales que se conocen. Así ha sido interpretado en comentarios, Colegio de Abogados, *Código Penal de Puerto Rico*, págs. 118–119, San Juan, 1975; y también ha sido sostenido en la jurisprudencia federal. [*Acevedo*] *Montalvo* v. [*Hernández*] *Colón*, 377 F.Supp. 1332, 1343–1344 (D.P.R. 1974).

Como cuestión de hecho, tanto el Art. 1 de la Ley Núm. 136 como el vigente Art. 91 del Código Penal se colocan dentro de la mayor perspectiva de permisibilidad ante el aborto, toda vez que prescriben para todo el período de embarazo, el criterio constitucional establecido por el Tribunal Supremo federal para el primer trimestre, cual es, que la paciente en consulta con su médico, sin la intervención del Estado, puede poner fin a su embarazo. ([13]) Tal criterio no afecta, por tanto, nuestro estatuto que prohíbe que persona alguna que no sea médico autorizado en Puerto Rico procure o intente un aborto, y que prohíbe además que aun tal médico lo

necesario para evitar daño *serio y permanente* a la salud de la madre. De manera que [*Acevedo*] *Montalvo* v. [*Hernández*] *Colón*, 377 F.Supp. 1332 (D.P.R. 1974), no puede utilizarse como autoridad *"contra"*, con respecto a los casos que invoca la opinión del Juez Presidente puesto que en dicho caso el Tribunal federal de Puerto Rico se limitó, al igual que lo hacemos en esta opinión, a sostener la constitucionalidad del estatuto puertorriqueño aplicando el caso señero de *Doe* v. *Bolton*.

En igual sentido los comentaristas que invoca la concurrencia y disidencia no sostienen la novel posición allí propuesta limitándose la generalidad de ellos a relacionar los muy sabidos criterios *Wade-Bolton* para los tres trimestres de embarazo.

([13]) "El perjuicio que el Estado impondría a una mujer embarazada al negarle enteramente la opción [de poner fin a su embarazo] es aparente. Puede existir algún mal específico y directo médicamente diagnosticable aun en los comienzos de la preñez. La maternidad, o prole adicional, puede forzar sobre una mujer penosa vida futura. Un perjuicio psicológico puede ser inminente. La salud mental y física puede ser afectada por el cuido de una criatura. También existe la angustia de todos los afectados, como consecuencia del niño no deseado, y el problema de sumar un niño a una familia de por sí sicológicamente o de otro modo imposibilitada para cuidarlo. En otros casos, como en éste, pueden estar presentes las dificultades adicionales del estigma continuo de una madre no casada. Todos éstos son factores que la mujer y su médico responsable necesariamente tendrán en cuenta en la consulta al respecto." *Roe* v. *Wade*, 410 U.S. a la pág. 153.

procure o intente sin mediar razón terapéutica ([14]) alguna para la conservación de la salud o vida de la embarazada. *Roe* v. *Wade*, a las págs. 153, 164. Véase *Court Labors Over Roe v. Wade and Gives Birth to New Standard*, 30 Mercer L. Rev. 761–763 (1979). En cuanto a los próximos dos trimestres dicho alto tribunal reconoce que el Estado puede ser más estricto. Nuestra legislación resulta ser más laxa que el criterio adoptado en *Roe* v. *Wade*, pero la adopción de un estatuto más estricto conforme las normas establecidas en *Wade* y *Bolton*, es tarea que corresponde en razón de su función al mejor criterio de la Asamblea Legislativa. Mientras no se efectúen cambios, el criterio en Puerto Rico continuará siendo más permisible que el expresado por el Tribunal Supremo federal.

## V (*)

En el caso de autos el Ministerio Público no demostró que el médico apelante actuara al margen de toda consideración médica.

Ante este Tribunal sólo resalta el hecho escueto de que, siendo éste un proceso criminal, no hay prueba de ausencia de "indicación terapéutica" hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico, con vista a "la conservación de la salud" de la madre. El juicio del médico debe, pues, prevalecer y su condena debe revocarse.

---

([14]) A pesar de que en *Bolton* se sostuvo la validez de un estatuto que sólo excluía del ámbito penal un aborto hecho por un médico atendiendo a su mejor juicio clínico, la opinión del Juez Presidente intenta invalidar la voz "terapéutica" de nuestro estatuto, sin considerar que el propósito terapéutico a que se refiere nuestro estatuto y el juicio clínico a que se refiere el sostenido en *Bolton* tienen exacto contenido. La voz inglesa *"clinical"* usada en el estatuto de Georgia significa en español "clínico". F. Ruiz Torres, *Diccionario Inglés-Español y Español-Inglés de Medicina*, pág. 98, Bilbao, 1965. "Clínico", es a su vez aquello relativo a la práctica de la medicina, Real Academia Española, *Diccionario de la Lengua Española*, 1970, pág. 311, Madrid; que como sabemos, es la ciencia o arte de precaver y curar las enfermedades del cuerpo. *Id.*, pág. 860. No podemos entonces distinguir el concepto de "juicio clínico" del concepto "terapéutico" que indica lo perteneciente a la parte de la medicina que versa sobre el tratamiento de las enfermedades. *Id.*, pág. 1256. Ahora bien, ya hemos consignado a la luz de *Vuitch* que el concepto "salud" de nuestro estatuto abarca los más extensos parámetros de salud física o mental.

## VI (*)

Sólo nos queda considerar, finalmente, los argumentos adicionales que esgrime el Procurador General en cuanto al consentimiento de la menor en quien se practicó el aborto. El argumento del Procurador en ese sentido se desvanece por varias razones. En primer lugar, nuestro estatuto criminal no visualiza distinción entre pacientes mayores o menores de edad para los propósitos del juicio clínico requerido del médico. Código Penal, Art. 8, 33 L.P.R.A. sec. 3031. Más aún, la Asamblea Legislativa no puede conceder un veto absoluto a los padres con respecto a la decisión sobre aborto de la menor, *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52, 72–75 (1976); *Bellotti* v. *Baird*, 444 U.S. 887 (1979); y sobre todo, el Estado no ha demostrado que la menor en quien se practicó el aborto que motivó la acusación de autos careciera de madurez intelectual suficiente o padeciera de impedimento alguno que violentara la integridad de su decisión de terminar el embarazo.

## VII (*)

*Debe revocarse la convicción del apelante y absolvérsele del delito que le fue imputado.*

El Juez Presidente Señor Trías Monge emitió opinión concurrente en parte y disidente en parte a la que se unen los Jueces Asociados Señores Rigau y Díaz Cruz quien además suscribió opinión separada. El Juez Asociado Señor Dávila emitió además voto particular y el Juez Asociado Señor Irizarry Yunqué emitió opinión concurrente y disidente.

—O—

Opinión particular del Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 17 de abril de 1980

Al unirme a la opinión del Tribunal es pertinente consignar mi gran preocupación por el hecho de que nuestra Asamblea

Legislativa no haya provisto a nuestra jurisdicción con un estatuto que establezca un esquema adecuado para reglar la materia del aborto. Los disímiles intereses que confligen sobre tan neurálgico tema requieren, sin duda, un esquema legal mucho más complejo del que tenemos. Nada dispone el estatuto vigente sobre los dos últimos trimestres, que de acuerdo con los casos de *Roe* v. *Wade*, 410 U.S. 113 (1973) y *Doe* v. *Bolton*, 410 U.S. 179 (1973), pueden ser reglamentados más rigurosamente. El no reglamentarla presenta serios problemas jurídicos y sociales. No obstante, ésta es prerrogativa de la Asamblea Legislativa.

—O—

Opinión disidente en parte y concurrente en parte del Juez Presidente, Señor Trías Monge, a la cual se unen los Jueces Asociados Señores Rigau y Díaz Cruz.

San Juan, Puerto Rico, a 17 de abril de 1980

Disiento de la conclusión del Tribunal de que el Art. 266 del Código Penal de 1937, 33 L.P.R.A. sec. 1053, y el Art. 1 de la Ley Núm. 136 de 15 de mayo de 1937, 33 L.P.R.A. sec. 1051, son válidos en su totalidad. Concurro con el dictamen de que el médico acusado debe ser absuelto.

El Ministerio Público acusó al apelante del delito de aborto. El lenguaje utilizado fue básicamente el comprendido en el Art. 266 del Código Penal de 1937 y en los Arts. 1 y 2 de la Ley Núm. 136 de 15 de mayo de 1937. Tras juicio por panel de jurados se le halló culpable. Fue sentenciado a cumplir de dos a cuatro años de reclusión.

El aborto se practicó el 24 de julio de 1973, antes de los tres meses del embarazo, (¹) en una joven de dieciséis años de

---

(¹) La prueba revela que el médico apelante expresó que la joven tenía de dos a tres meses de embarazo al momento del aborto. E.N.P., págs. 1, 3. El Juez Superior, Hon. Juan Marcano, determinó que el aborto se produjo en la sexta semana. *Legajo de Sentencia*, pág. 207. El Juez Superior, Hon. José A. Casillas, expresó que se provocó el aborto cuando la joven ya contaba tres meses de embarazo, *ibid.*, pág. 141, pero la propia prueba de cargo demuestra que la última menstruación de la joven fue

edad. La joven no obtuvo el consentimiento y asesoramiento de sus padres antes de someterse a la intervención médica. La prueba no indica que el apelante indujo el aborto por ser necesario para salvar la vida de la mujer o con vistas a la conservación de la salud o vida de su paciente. Tampoco revela que la menor era inmadura y que su consentimiento al aborto fue nulo.

El apelante argumenta fundamentalmente ante nos, según lo hizo en primera instancia, que el Art. 266 del Código Penal de 1937, 33 L.P.R.A. sec. 1053, (²) es inválido por contravenir

para el 7 de mayo de 1973. E.N.P., pág. 2. Véanse, además, las conclusiones de hechos del tribunal en la versión civil de este caso. *A. L. Quiñones et al.* v. *P. Duarte Mendoza*, Núm. 79-215. Ya que el aborto se practicó el 24 de julio, el alegado acto criminal se cometió antes de los tres meses siguientes a la concepción.

(²) El Art. 266 del Código Penal de 1937 dispone:

"Toda persona que proporcionare, facilitare, administrare o hiciere tomar a una mujer cualquier medicina, droga o sustancia, o que utilizare o empleare cualquier instrumento u otro medio, con intención de hacerla abortar, excepto el caso de que fuere necesario para salvar su vida, y toda persona que ayudare a la comisión de cualquiera de dichos actos incurrirá en pena de presidio por un término de dos a cinco años."

Poco tiempo después, la Ley Núm. 136 de 15 de mayo de 1937, Art. 1, 33 L.P.R.A. sec. 1051, decretó:

"Por la presente se prohíbe, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico con vista a la conservación de la salud o vida, el indicar, aconsejar o inducir a abortar o practicar el aborto en una mujer embarazada."

El Art. 2 de esta ley reza:

"Toda persona o personas que en violación de lo preceptuado en la sec. 1051 de este título, proporcionare, facilitare, prescribiere, administrare por vía inyectable, oral, rectal o vaginal a una mujer embarazada, alguna droga, sustancia, agente medicamentoso, terapéutico u opoterápico, utilizare cualquier instrumento quirúrgico o agente mecánico, con la intención o propósito de provocarle aborto o le practicare el aborto, incurrirá en delito grave, y convicta que fuere, será castigada con pena de presidio de cinco a diez años en primera convicción y con pena de diez años en casos de reincidencias."

El Art. 91 del Código Penal de 1974, 33 L.P.R.A. sec. 4010, se funda básicamente en las primeras dos disposiciones citadas. Véanse los informes mimeografiados de la Comisión de lo Jurídico Penal de la Cámara de Representantes sobre el P. de la C. 927 y el P. del S. 753, págs. 31 y XLIII, Secretaría de la Cámara.

El Art. 91 provee:

"Toda persona que permita, indique, aconseje, induzca o practique un aborto, toda persona que proporcionare, facilitare, administrare, prescribiere o hiciere tomar a una mujer embarazada cualquier medicina, droga, o sustancia o que utilizare o empleare cualquier instrumento u otro medio con intención de hacerla

la Constitución de Estados Unidos. El Ministerio Público se apoya básicamente en la ausencia de consentimiento de los padres y en la alegada falta de consentimiento cabal de la joven.

La resolución de esta causa exige el examen de varios temas: la base de la aplicación en Puerto Rico de ciertas disposiciones de la constitución estadounidense; el efecto, si alguno, de *Roe* v. *Wade*, 410 U.S. 113 (1973); *Doe* v. *Bolton*, 410 U.S. 179 (1973); *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52 (1976); y *Bellotti* v. *Baird*, 444 U.S. 887 (1979), en nuestra legislación sobre el aborto; el estudio de las circunstancias que pudiesen impedir conceciblemente la aplicación de estas decisiones en Puerto Rico; y, de no aplicarse estas decisiones en nuestro medio, el análisis de estas cuestiones a la luz de la Constitución de Puerto Rico. Al considerar estos asuntos tendremos que referirnos por fuerza a aspectos de su trasfondo jurídico y social.

I. *La base para la aplicación en Puerto Rico de ciertas disposiciones de la Constitución de Estados Unidos*

La Constitución de Estados Unidos no se extiende a Puerto Rico *ex proprio vigore*. *Downes* v. *Bidwell*, 182 U.S. 244 (1901). La concesión de la ciudadanía norteamericana a los puertorriqueños tampoco hizo aplicable la totalidad de la constitución estadounidense a esta comunidad, por estimarse que Puerto Rico no había sido incorporado a Estados Unidos. *Balzac* v. *People of Porto Rico*, 258 U.S. 298 (1922). Antes de 1952, los Casos Insulares [3] y otras decisiones sentaron la base para la aplicación en Puerto Rico de ciertas disposiciones de la Constitución de Estados Unidos que no chocaban con la realidad puertorriqueña. Es innecesario, no obstante, examinar la teoría que anima esta jurisprudencia. Desde 1952 es

---

abortar, y toda persona que ayudare a la comisión de cualquiera de dichos actos, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico, con vista a la conservación de la salud o vida de la madre, será sancionada con pena de reclusión por un término mínimo de dos años y máximo de cinco años."

[3] Véase: Ramírez, *Los Casos Insulares*, 16 Rev. Jur. U.P.R. 2 (1946).

sencillo en extremo identificar el fundamento para la continuada aplicación en este país de diversas disposiciones de la Constitución de Estados Unidos. En julio de ese año el Congreso aprobó la Constitución del Estado Libre Asociado, sujeto a que se agregase a la Sec. 3 de su Art. VII esta oración: "Cualquier enmienda o revisión de esta constitución deberá ser compatible . . . con las disposiciones aplicables de la Constitución de Estados Unidos . . .". R.C. de 3 de julio de 1952, Cap. 567, 66 Stat. 327. La Asamblea Constituyente de Puerto Rico convino en aceptar esta condición. Res. Núm. 34, sesión plenaria de 10 de julio de 1952, 4 *Diario de Sesiones de la Convención Constituyente* 2539–2552.

Las disposiciones de la Constitución de Estados Unidos que hasta entonces eran aplicables lo continúan siendo, en consecuencia, por el acuerdo solemne de las partes y la frase añadida a su amparo a la Sec. 3 del Art. VII de la Constitución de Puerto Rico. Debemos examinar, por tanto, las decisiones del Tribunal Supremo de Estados Unidos sobre el aborto para precisar su papel en este caso.

II. *La naturaleza del derecho amparado en Roe v. Wade, Doe v. Bolton y su progenie*

En *Wade*, el Tribunal Supremo de Estados Unidos se enfrentó a un ataque a la validez constitucional de una ley tejana, parecida al Art. 266 de nuestro Código Penal de 1937, que penaba la provocación del aborto excepto "cuando fuere necesario para salvar la vida de la madre". En *Bolton* analizó la constitucionalidad de otras disposiciones, esta vez de Georgia.

El Tribunal Supremo de Estados Unidos fundó sus dictámenes en *Wade, Bolton, Danforth* y *Bellotti* en el derecho a la intimidad, el cual derivó del concepto de la libertad personal incluido en la enmienda decimocuarta de la constitución norteamericana. Cabe preguntar entonces, ¿es esta disposición aplicable a Puerto Rico? ¿Se deriva de la quinta o de la decimocuarta enmienda o de otra parte de la Constitución de Estados Unidos? Desde *Downes* v. *Bidwell*, 182 U.S. 244,

290–91 (1901), se decidió que la constitución estadounidense reconoce ciertos derechos de orden tan fundamental que no pueden transgredirse aun en el caso de comunidades vinculadas a Estados Unidos, pero que no son parte integrante de la Unión Americana. Éste ha sido el criterio decisivo para determinar la aplicabilidad en Puerto Rico de determinadas disposiciones de la constitución federal. Véanse: *Balzac* v. *People of Porto Rico*, 258 U.S. 298, 303–310 (1922); *People of Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 257 (1937). El Tribunal Supremo de Estados Unidos señaló en *Wade*, págs. 152–156, el carácter fundamental del derecho a la intimidad. Igual rango se le otorgó en Puerto Rico al incluirse este derecho expresamente en la Sec. 8, Art. II, de la Constitución del Estado Libre Asociado, tal como se había hecho en el Art. 12 de la Declaración Universal de los Derechos del Hombre. El Tribunal Supremo de Estados Unidos ha resuelto, además, que la cláusula sobre el debido proceso de ley rige en Puerto Rico, bien sea a través de la quinta o decimocuarta enmienda. *Fornaris* v. *Ridge Tool Co.*, 400 U.S. 41 (1970); *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 668, n. 5 (1974); *Ex. Bd. of Eng. Arch. and Sur.* v. *Flores de Otero*, 426 U.S. 572, 599–601 (1976).

Al igual que los estados federados de la Unión Americana, Puerto Rico puede expandir los derechos garantizados por la Constitución de Estados Unidos, pero no contraerlos. *Pueblo* v. *Dolce*, 105 D.P.R. 422, 426–28 (1976). Véase: Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977). *Wade, Bolton, Danforth* y *Bellotti* obligan, por tanto, a este Tribunal y a otros órganos gubernamentales puertorriqueños, hasta donde definan el ámbito mínimo del derecho a la intimidad, a menos que medien otras consideraciones.

Corresponde ahora examinar en detalle el significado de *Wade* y *Bolton* y de *United States* v. *Vuitch*, 402 U.S. 62 (1971).

III. *El significado de Wade, Bolton y Vuitch*

En *Wade*, el Tribunal extendió las normas sentadas en *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), y *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972), y expresó que el derecho a la intimidad "es suficientemente amplio para incluir la decisión de una mujer de dar fin o no a su estado de embarazo". 410 U.S. a la pág. 153 (traducción nuestra). Tal derecho no es absoluto (*ibid.*, pág. 154), pero se cuenta entre los derechos fundamentales, por lo que su reglamentación "puede justificarse tan solo por un 'interés estatal imperioso' " (*ibid.*, pág. 155). Puede llegar un momento, continuó el Tribunal, en que el Estado pueda resolver legítimamente que la salud de la madre o el interés en proteger una potencial vida humana exige su intervención (*ibid.*, pág. 159). Expone el Tribunal entonces las reglas para precisar las etapas en que es válida la intervención del Estado. El profesor Laurence H. Tribe las resume así, a la luz tanto de *Wade* como de *Bolton:*

"Durante el primer trimestre del embarazo, cuando el aborto entraña menos peligro para la vida de la mujer que el alumbramiento, el estado puede requerir únicamente que un médico debidamente autorizado practique el aborto; ninguna otra reglamentación del aborto se justifica imperiosamente en dicho término. [4]

"Después del primer trimestre, el interés estatal imperioso en la salud de la mujer le permite adoptar reglas razonables para promover abortos seguros, pero le impide exigir que el aborto se practique en hospitales, o únicamente con la aprobación de otro doctor o de un comité, en adición al facultativo de la paciente, o conforme a determinada técnica que, por preferible que sea desde una perspectiva médica, no está generalmente disponible.

"Tan pronto como el feto es viable, en el sentido de que puede vivir fuera del útero con ayuda artificial, el interés del estado en preservarlo adquiere carácter imperioso y el estado está libre de prohibir su extracción prematura (*i.e.*, el aborto) excepto para preservar la vida o la salud de la madre...." L. H. Tribe, *American Constitutional Law*, Mineola, N.Y., The Foundation Press, 1978, págs. 924–925 (5) (traducción nuestra).

---

(4) Con la única excepción, señala en la n. 27, pág. 925, del mantenimiento de los récords confidenciales a que se refiere *Danforth*, supra, 428 U.S. 52, 79–81 (1976).

(5) Hemos eliminado de esta cita los escolios indicativos de las páginas de *Wade* y *Bolton* en que se hallan las conclusiones que Tribe resume.

Como señala la propia Corte Suprema de Estados Unidos, las opiniones en *Wade* y *Bolton* deben leerse conjuntamente. *Wade*, pág. 165. Esto no quiere decir, en el contexto de estas opiniones, que *Bolton* condiciona a *Wade*, como asume la opinión mayoritaria en el caso de autos, sino que lo suplementa. *Wade* declaró inconstitucional un estatuto de Tejas, similar al Art. 266 del Código Penal de 1937 nuestro, que eximía de la legislación contra el aborto "los realizados o intentados por consejo médico con el propósito de salvar la vida de la mujer." *Wade*, pág. 117, n. 1; 164. *Bolton* consideró exclusivamente, según se señala en *Wade*, pág. 165, ciertos requisitos *procesales* de un estatuto de Georgia análogo en parte al Art. 1 de la Ley Núm. 136 de 15 de mayo de 1937. ([6]) Como se desprende del resumen de Tribe, que es representativo de la interpretación de estos casos por la jurisprudencia, la legislación y la doctrina actuales, según veremos más adelante, *Bolton* no afecta la regla de *Wade* sobre la ausencia de poder alguno del Estado para imponer durante aproximadamente el primer trimestre del embarazo ningún otro requisito que no sea la participación de un médico debidamente autorizado para ejercer la medicina en Puerto Rico. El Estado carece durante dicho término de facultad para intervenir con la decisión de la mujer y el juicio profesional del médico, aun cuando sea para proteger la salud de la paciente y aun cuando se interprete la voz "salud" en la forma más lata posible.

La decisión de la mayoría en el caso de autos es irreconciliable con *Wade* en cuanto no declara inconstitucional el Art. 266 del Código Penal de 1937, 33 L.P.R.A. sec. 1053, el cual no

---

([6]) La opinión mayoritaria se equivoca al sostener lo contrario en el escolio número 7. A la página 187 de *Bolton*, el Tribunal Supremo de Estados Unidos expresó:

"The extent, therefore, to which the District Court decision was adverse to the defendants, that is, *the extent to which portions of the Georgia statutes were held to be unconstitutional, technically is not now before us, Swarb* v. *Lennox*, 405 U.S. 191, 201, 31 L.Ed.2d 138, 92 S.Ct. 767 (1972)." (Bastardillas nuestras.)

Estas expresiones se encuentran en la Parte II de *Bolton*. La mayoría no consideró esta parte esencial.

quedó enteramente comprendido por el Art. 1 de la Ley Núm. 136 de 15 de mayo de 1937, 33 L.P.R.A. sec. 1051. La decisión de la mayoría es también irreconciliable con *Wade* y *Bolton* en cuanto no declara inconstitucional la parte del Art. 1 de la Ley Núm. 136 referente a que la indicación del médico debe ser "terapéutica" y "con vista [*sic*] a la conservación de la salud o vida". La decisión emitida hoy se guía más por el criterio de la opinión disidente del Juez White, con la que concurre Rehnquist, en *Wade* y *Bolton,* que por el juicio de la mayoría. 410 U.S. 179, 221–23. Véase, en especial, el uso de *United States* v. *Vuitch,* 402 U.S. 62 (1971), ([7]) en la referida opinión disidente en *Wade* y *Bolton* y en la opinión mayoritaria aquí. Examinemos en más detalle a *Bolton* para determinar con mayor precisión por qué la parte señalada del Art. 1 de la Ley Núm. 136 es inconstitucional.

Así como el estatuto de Tejas repudiado en *Wade* es similar al Art. 266 de nuestro Código Penal de 1937, el estatuto de Georgia, Ga. Crim. Code, sec. 26-1202 (1968), analizado en *Bolton,* es análogo en parte al Art. 1 de nuestra Ley Núm. 136 de 1937.

El Art. 26-1201 de Georgia definía el delito de aborto criminal, del cual excluía lo dispuesto en el Art. 26-1202. Este último artículo, hoy derogado junto al 26-1201, disponía en su apartado (a):

"(a) El artículo 26-1201 no se aplicará a un aborto practicado por un facultativo debidamente autorizado a ejercer la medicina y la cirugía conforme el Capítulo 84-9 u 84-12 del Código de Georgia de

---

([7]) *Vuitch* simplemente resuelve que un estatuto del Distrito de Columbia parecido al Art. 1 de nuestra Ley Núm. 136 de 15 de mayo de 1937 no es vago o impreciso, desde el punto de vista constitucional, por hablar en términos generales de la palabra "salud". Como explica el propio Tribunal, 402 U.S. 62, 73, ésta fue la única cuestión constitucional que estuvo ante su consideración. La Corte no expresó juicio alguno sobre la constitucionalidad del estatuto a la luz del derecho a la intimidad. *Vuitch* no afecta en este sentido, excepto a juicio de los Jueces White y Rehnquist, las normas de *Wade* y *Bolton.* La mayoría critica en el escolio 14 la opinión concurrente y disidente a base de que no equipara las voces "terapéutico" y "juicio clínico". No hemos hallado base alguna en la doctrina o en la jurisprudencia que justifique tal posición, fuera del criterio disidente del Juez White.

1933, según enmendado, que estime, sobre la base de su mejor juicio clínico, que el aborto es necesario *porque:*

(1) *La continuación del embarazo haría peligrar la vida de la mujer encinta o seria y permanentemente perjudicaría su salud; o*

(2) *El feto podría nacer muy probablemente con un defecto grave, permanente e irremediable de orden mental o físico; o*

(3) *El embarazo resultó de una violación forzosa o estatutaria.*" (Bastardillas nuestras.)

El apartado (b) del Art. 1202 imponía otros requisitos que el citado resumen de Tribe abarca básicamente y que nuestra legislación no recoge.

La Corte de Distrito de Estados Unidos para el Distrito Norteño de Georgia declaró inconstitucional la parte en bastardillas del Art. 1202(a). *Doe* v. *Bolton*, 319 F.Supp. 1048 (N.D. Ga. 1970). Es importante advertir al respecto que el Tribunal Supremo en *Bolton no intervino con esta decisión,* ya que se limitó al estudio de las condiciones impuestas en el apartado (b) del Art. 1202. La decisión que tuvo impacto sobre el apartado (a) fue la de *Wade. Wade* anula forzosamente la parte en bastardillas del estatuto de Georgia, ya que el interés del Estado en proteger la salud de la madre no adquiere suficiente peso hasta aproximadamente el final del primer trimestre. *Wade* también permite que se requiera la participación de un médico en todo momento, tal como fue requerido por la parte no en bastardillas del Art. 1202(a) de Georgia. La dificultad con la opinión mayoritaria en el caso de autos es que entiende que las normas sentadas en *Wade* se aplican tan solo a los estatutos semejantes al de Tejas. El problema con tal posición es que no está respaldada por la legislación, la doctrina o la jurisprudencia posteriores a *Wade.*

El propio estado de Georgia enmendó su legislación sobre el aborto a raíz de *Bolton* y *Wade* para conformarla con el entendido general de su significado. Ga. Code Ann. 26-1201 *et seq.* (1973). Georgia retuvo del apartado (a) del Art. 1202 tan solo la parte no en bastardillas. Los nuevos apartados (b) y (c) del Art. 1202 rezan:

"(b) No se autoriza ni se practicará ningún aborto *después del primer trimestre* excepto en un hospital acreditado o en un establecimiento de salud con licencia para practicar abortos otorgada por el Departamento de Salud de Georgia.

(c) No se autoriza ni se provocará ningún aborto *después del segundo trimestre* a menos que el facultativo a cargo y dos médicos consultores certifiquen que el aborto es necesario para preservar la vida o salud de la mujer. . . ."

Muchos estados reconocen por legislación la ausencia de poder para reglamentar el aborto durante el primer trimestre de embarazo. Entre estos se cuentan: Alaska, Florida, Hawaii, Illinois, Indiana, Maine, Massachusetts, Missouri, Nevada, New York, North Dakota, Pennsylvania, South Dakota, Tennessee, Vermont, Virginia y Washington. [8]

Otro grupo nutrido no alteró su legislación y varios la enmendaron en modos todavía conflictivos con *Wade* y *Bolton*. [9] Los tribunales que han tenido ocasión de dictaminar sobre estas leyes han honrado las normas expuestas en estos dos pleitos, según las entienden Tribe y otros comentaristas. Véanse: *People* v. *Frey,* 294 N.E.2d 257 (Ill. 1973); *State* v. *Munson* 206 N.W.2d 434 (S.D. 1973); *State* v. *Lawrence,* 198 S.E.2d 253 (S.C. 1973); *Hodgson* v. *Lawson,* 542 F.2d 1350 (8th Cir. 1976); *Larkin* v. *McCann,* 368 F.Supp. 1352 (E.D. Wis. 1974); *Abele* v. *Markle,* 369 F.Supp. 807 (D. Conn. 1973); *State* v. *Norflett,* 337 A.2d 609 (N.J. 1975); *Mahoning Women's*

[8] *Vide:* Alaska Stat. sec. 11.15.060; sec. 18.16.010 (Supl. 1979); Florida Stat. Ann. sec. 797.03 (West, Supl. 1979); Haw. Rev. Stat. sec. 453-16 (1976); Ill. Ann. Stat. 38, sec. 81-11 (Smith-Hurd); Ind. Code Ann. sec. 35-1-58.5-1 (Burns); Me. Rev. Stat. 22 sec. 1598 y 17 secs. 51–53 (Supl. 1979); Mass. Gen. Laws Ann. 17, sec. 12L; Mo. Rev. Stat. secs. 188.015–.028; .030; .035; .037; .039; .052; .055; .060; .063; .075 (1979 Legislative Service No. 1); Nev. Rev. Stat. 442.250 y 201.20; N.Y. Penal Law 125.05 (McKinney); N.D. Cent. Code sec. 14-02.1-04; Pa. Stat. Ann. 18-783; 603; S.D. Compiled Laws Ann. sec. 34-23A-3; Tenn. Code Ann. sec. 39-301; Vt. Stat. Ann. 13 secs. 101–104; Va. Code 1950, secs. 18.2-71–76 (Repl. 1975 y Supl. 1979); Wash. Rev. Code Ann. sec. 9.02.070. Véase, además, el estatuto de las Islas Vírgenes: V.I. Code Ann. 14, sec. 151.

[9] *Vide, inter alia:* Ala. Code 13A sec. 13-7 (Supl. 1979) y 13 sec. 8-4 (1975); Ark. Stat. Ann. 1947, sec. 41-2551 *et seq.* (Repl. 1977); Conn. Gen. Stat. Ann. sec. 53-29 *et seq.* (1960 y Supl. 1978); Del. Code Ann. 11, sec. 651; secs. 1790–91 (1974 y Supl. 1976–1978); Idaho Code sec. 18-608 (Supl. 1975); Neb. Rev. Stat. 28-4.143–145; N.H. Rev. Stat. Ann. sec. 585.12 (Supl. 1977–1979); W. Va. Code sec. 61-2-8.

*Ctr.* v. *Hunter*, 444 F.Supp. 12 (N.D. Ohio, E.D. 1977); *Arnold* v. *Sendak*, 416 F.Supp. 22 (S.D. Ind. 1976), confirmado sumariamente en 429 U.S. 968 (1976); *Hodgson* v. *Anderson*, 378 F.Supp. 1008 (D. Minn. 1974); *People* v. *Norton*, 507 P.2d 862 (Colo. 1973). *Contra: Montalvo* v. *Colón*, 377 F.Supp. 1332, 1343-44 (D.P.R. 1974). (¹⁰) El propio Tribunal Supremo de Estados Unidos ha reafirmado en casos posteriores la carencia de poder del Estado para reglamentar el aborto durante el primer trimestre del embarazo, excepto en la forma indicada en *Wade* y *Danforth,* aunque sea con el propósito de preservar la salud o vida de la mujer. *Connecticut* v. *Menillo*, 423 U.S. 9 (1975); *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52 (1976); *Colautti* v. *Franklin*, 439 U.S. 379 (1979).

Lo expresado en el escolio 10 al efecto de que todos los estatutos sobre el aborto existentes en Estados Unidos cuando el Tribunal Supremo resolvió a *Wade* y *Bolton* quedaron anulados representa la opinión de multitud de comentaristas. Para aquel entonces 31 jurisdicciones contaban con estatutos análogos al de Tejas; en catorce se eximía de penalidad el aborto, como en Puerto Rico, cuando la continuación del embarazo pudiere afectar la salud mental y física de la mujer; y en cuatro privaban leyes que liberalizaban en grado mucho mayor la práctica del aborto. "Las decisiones en *Wade* y *Bolton*", escribió Frank Susman, "invalidaron de hecho todas estas leyes." Susman, *Roe v. Wade and Doe v. Bolton Revisited in 1976 and 1977—Reviewed? Revived? Revested?*

---

(¹⁰) Esta amplia gama de autoridades ilustra claramente, contrario a lo expresado en el escolio 13 de la opinión mayoritaria, que *todos* los estatutos sobre el aborto existentes en Estados Unidos cuando el Tribunal Supremo federal resolvió a *Wade* y *Bolton* quedaron anulados *ipso facto.* La jurisprudencia y la doctrina citadas se refieren a estatutos análogos a los de Tejas, Georgia y otros. En consecuencia es apropiado citar a [*Acevedo*] *Montalvo* v. [*Hernández*] *Colón*, 377 F.Supp. 1332 (D.P.R. 1974), como autoridad *contra,* ya que es el único caso que se aparta de la doctrina mayoritaria y no ha sido seguido en ninguna otra jurisdicción, como tampoco el criterio sostenido por la mayoría en el día de hoy. Adviértase que la mayoría no ha citado un solo comentarista que sostenga su posición.

*Reversed? or Revoked?*, 22 St. Louis U.L.J. 581, 582 (1978). [11] Susman también añade muchos casos a los citados en el párrafo anterior en apoyo de su aserto al efecto de que "[l]as cortes federales han invalidado consistentemente las leyes estatales que no observen las distinciones fundadas en las etapas de gestación que menciona *Wade*." Susman, *op. cit.*, pág. 582, n. 11.

En un artículo publicado a raíz de la decisión de *Wade* y *Bolton*, Laurence H. Tribe también expresó el criterio de que estos casos anularon toda la legislación sobre el aborto en Estados Unidos. Tribe, *The Supreme Court 1972 Term— Foreword: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv. L. Rev. 1, 2 (1973). Al mismo efecto: Anderson, Bennett, Coleman, Weiss, Wray, *Abortion after Roe and Doe: A Proposed Statute*, 26 Vand. L. Rev. 823 (1973). Sobre el hecho de que *Bolton* y *Vuitch* no afectan la norma de *Wade* sobre la primera etapa del embarazo, véanse: Dourlen-Rollier, *Legal Problems Related to Abortion and Menstrual Regulation*, 7 Colum. Human Rights L. Rev. 120, 129–130 (1975); Tribe, *op. cit.*, 87 Harv. L. Rev. 1, 11, 16 *et seq.*, 30, 38 (1973); Note, *Abortion Regulation: Louisiana's Abortion Attempt*, 34 La. L. Rev. 676 (1974); Note, *Developments in Minn. Laws—1974*, 54 Minn. L. Rev. 785, 800 (1975); Comments, *State Limitations upon the Availability and Accessibility of Abortions under Wade and Bolton*, 25 Kan. L. Rev. 87 (1976); Note, *Implications of the Abortion Decisions: Post Roe and Doe Litigation and Legislation*, 74 Col. L. Rev. 237, 238–39 (1974); Dellapenna, *The History of Abortion: Technology, Morality, and Law*, 40 U. Pitt L. Rev. 359, 360, 426 (1979).

*Wade* y *Bolton*, por tanto, afectan la constitucionalidad de la totalidad del Art. 266 del Código Penal de 1937, 33 L.P.R.A. sec. 1053, similar al equivalente de Tejas; de la parte

---

[11] El autor expresa fundamentalmente en este artículo su preocupación por las decisiones emitidas en *Beal* v. *Doe*, 432 U.S. 438, 97 S.Ct. 2366 (1977); *Maher* v. *Roe*, 432 U.S. 526, 97 S.Ct. 2376 (1977); y *Poelker* v. *Doe*, 432 U.S. 519, 97 S.Ct. 2391 (1977), que tratan sobre la existencia o no del derecho a fondos públicos para sufragar los abortos autorizados, cuestión que no está ante nuestra consideración.

del Art. 1 de la Ley Núm. 136 de 15 de mayo de 1937, parecida a la porción del estatuto de Georgia declarada nula, y de la parte del Art. 2 del referido estatuto semejante a la excluida del Art. 1, a menos que existan circunstancias que concebiblemente puedan impedir la aplicación de estos casos en Puerto Rico. Esto exige preguntarnos si nuestras realidades socioculturales y jurídicas exigen verter un contenido distinto en los conceptos del adecuado proceso de ley y el derecho a la intimidad en este caso.

IV. *El trasfondo jurídico y sociocultural*

Ni el Código Penal de 1937 ni el vigente desde 1974 representan la tradición histórica puertorriqueña. El Código Penal español de 1870, según enmendado por la Ley de 17 de julio de 1876, fue extendido a Puerto Rico el 23 de mayo de 1879. Este Código castigaba el aborto, mediase o no el consentimiento de la mujer. No se permitía el aborto terapéutico, como se permite ahora en Puerto Rico, ni el eugenésico, ni el de ninguna otra clase. La prohibición era absoluta. El aborto no se toleraba en ningún género de circunstancias. Arts. 426 al 428. Véase: S. Viada y Vilaseca, *Código Penal Reformado de 1870*, 3ra ed., Madrid, Librería de Fernando Fé, 1885. La severa represión del aborto se remonta al Fuero Juzgo y otros grandes cuerpos jurídicos españoles, aunque su punición sufrió variaciones. E. Cuello Calón, *Derecho Penal*, Ed. Bosch, Barcelona, 1972, T. II, Vol. 2, 13ra ed., pág. 521 *et seq.;* J. Maldonado y Fernández del Torco, *La Condición Jurídica del "Nasciturus" en el Derecho Español*, Gráficas González, Madrid, 1946, *passim.*

Al adoptar el Código Penal de California en 1902, la Asamblea Legislativa de Puerto Rico descartó el derecho vigente y legalizó el aborto terapéutico. *Compilación de los Estatutos Revisados y Códigos de Puerto Rico*, Bureau of Supplies, Printing and Transportation, 1914–16, pág. 954, Arts. 5708, 5710; *Estatutos Revisados y Códigos de Puerto Rico*, 1902, págs. 585–86, Arts. 266–68 del Código Penal; J. Kerr, ed., *The Codes of California*, 2da ed., Vol. 4; *Penal Code,*

Bender-Moss Co., San Francisco, 1921, pág. 373, Art. 274. El Código Penal de California se adoptó el 14 de febrero de 1872.

La legislación californiana de 1872 y la nuestra de 1902, 1937 y 1974 son contrarias a la doctrina de la Iglesia Católica, Apostólica y Romana, por lo que tampoco puede validarse la totalidad de los artículos concernidos del Código Penal de 1937 a nombre de una tradición religiosa de siglos, aun en el supuesto de que intentos de esta naturaleza sean constitucionalmente factibles.

Al igual que muchas otras iglesias, la Iglesia Católica prohíbe el aborto en términos absolutos. *Código de Derecho Canónico*, La Editorial Católica, 6ta ed., Madrid, 1957, Canon 2350, apartado 1, pág. 860. El Código se promulgó el 27 de mayo de 1917. Para la versión anterior, véase: *Corpus Juris Canonici*, Ed. E. Friedberg, Leipzig, 1879–1881. El Papa Pío XI denunció vigorosamente el aborto en su encíclica *Casti Connubii*, 22 *Acta Apostolicae Sedis* 562 (1930). La vida del embrión no puede destruirse ni aun para salvar la vida de la madre. *Ibid.*, 22 A.A.S. 562, 564 n. 151. La posición de Pío XII fue idéntica. *Discurso a la Sociedad Italiana Católica de Comadronas*, 43 A.A.S. 838–39 (1951). El Concilio Vaticano II, convocado el 25 de diciembre de 1961, declaró que el aborto es un crimen abominable, sin mencionar excepciones. *Concilio Vaticano II*, La Editorial Católica, Madrid, 1966, pág. 339. Pablo VI, en su encíclica *Humanae vitae*, 60 A.A.S. 481–503 (1968), condenó específicamente, además, el aborto terapéutico. El actual Papa Juan Pablo II ha endosado vigorosamente la posición de que todo género de aborto constituye un crimen. *The New York Times*, 6 de octubre de 1979, pág. 11. La doctrina de la Iglesia Católica es clara, aunque hubo voces en su seno a partir de mediados del siglo XV, especialmente la de los casuistas, que consideraron que la salvación de la vida de la madre representaba un interés superior al de la vida del feto. Noonan, *An Almost Absolute Value in History*, en J. T. Noonan, ed., *The Morality of Abortion*, Harv. Univ. Press, Cambridge, 1970, pág. 58.

No alcanzan a media docena los países latinoamericanos que condenan hoy el aborto en términos absolutos. España, Portugal y Bélgica pertenecen a este grupo entre los países europeos. Hogue, *A Comparative Survey of Abortion Legislation: International Perspective,* en A. R. Oman, ed., *Liberalization of Abortion Laws: Implications,* Carolina Population Center, Univ. of North Carolina at Chapel Hill, 1976, págs. 187–192; Decreto de 14 de setiembre de 1973, texto refundido del Código Penal español, Aranzadi, *Nuevo Diccionario de Legislación,* 1975, T. 1, pág. 237; World Health Organization, *Abortion Laws, A Survey of Current World Legislation,* Geneva, 1971, pág. 7 *et seq.* En Francia se permite hoy el aborto bajo determinadas condiciones. L. Núm. 75-17 de 17 de enero de 1975, *Codes et Lois Usuels—Codes d'audience,* Dalloz, París, 36ta ed., pág. 547. Alemania Occidental lo condona también, aunque la Corte Constitucional anuló en nombre de la dignidad e inviolabilidad del ser humano una ley de 1974 que reconocía el derecho al aborto de toda mujer, siempre que se solicitase de un médico dentro de las doce semanas siguientes al embarazo. Decisión de 25 de febrero de 1975, 39 *Enstscheidungen des Bundesverfassungsgericht* 1 (1975). (¹²) La Corte resolvió que el aborto era permisible dentro de las doce semanas tan solo para evitarle daño severo a la mujer, no limitado a razones terapéuticas.

En la propia Italia se permite la interrupción de la gravidez por intervención médica cuando la gestación ulterior entraña daño o peligro grave a la salud de la madre. Este estado de derecho no es producto de acción alguna del parlamento italiano, sino el resultado de una decisión de la Corte Constitucional. La Corte utilizó el mismo principio de la dignidad e inviolabilidad del ser humano para anular esta

(¹²) El texto en inglés puede consultarse en el folleto *The Abortion Decision of February 25, 1975 of the Federal Constitutional Court, Federal Republic of Germany,* traducción e introducción de E. C. Jahn, 1975. Véase: Kommers, *Abortion and Constitution: United States and West Germany,* 25 Am. J. of Comp. L. 255 (1977). Para una crítica de esta decisión, véase: L. H. Tribe, *American Constitutional Law,* Mineola, N.Y., The Foundation Press, 1978, págs. 929–930.

vez el Art. 546 del Código Penal italiano. *Corte Costituzionale*, 18 de febrero de 1975, n. 27, 127 *Giurisprudenza Italiana*, 1415, parte 1, sez. 1. Para el tratamiento del problema en otros países, véase: Dourlen-Rollier, *Legal Problems Related to Abortion and Menstrual Regulation*, 7 Colum. Human Rights L. Rev. 120 (1975).

La marcha hacia la liberalización dentro de ciertos límites de las normas jurídicas sobre el aborto se ha acelerado en las últimas décadas. El derecho de toda persona a controlar su fertilidad se afirmó en la Conferencia de las Naciones Unidas sobre los Derechos Humanos celebrada en Teherán en 1968. La Asamblea General de las Naciones Unidas endosó esta Declaración al año siguiente. *Declaration on Social Progress and Development*, General Assembly Res. 2542, Art. 22(b), Doc. No. A/7630 (1969). M. Potts, P. Diggory y J. Peel, *Abortion*, Cambridge Univ. Press, Londres, 1977, pág. 525. Varios países, entre los que se encuentran, en adición a Estados Unidos, la Unión Soviética y la República Popular de China, reconocen el derecho incondicional al aborto durante los primeros tres meses del embarazo. J. van der Tak, *Abortion, Fertility, and Changing Legislation: An International Review*, D. C. Heath & Co., Lexington, Mass., 1974, pág. 7. Yugoslavia garantiza el derecho al aborto en su propia constitución. Hogue, *supra*, pág. 186.

*Roe* v. *Wade*, 410 U.S. 113 (1973), es por consiguiente parte de un movimiento que cruza muchas fronteras y se propaga en culturas muy diferentes. *Wade* no abrió brecha en el propio Estados Unidos. Antes de esta decisión, el estado de Nueva York permitió el aborto, sujeto a determinadas condiciones, dentro de las veinticuatro semanas de la gravidez. L. 1965, c. 1030, enmendada por la L. 1970, c. 127, sec. 1, N.Y. Penal Law (McKinney), sec. 125.05(3). Alaska y Hawaii también reformaron y ampliaron sus antiguas leyes sobre el aborto, lo que ocurrió también en el estado de Washington por referéndum. Las leyes de varios estados federados fueron anuladas por decisiones judiciales. Colorado y otros estados

liberalizaron desde el 1967 en adelante, aunque en grado menor, su legislación en este campo. P. G. Steinhoff y M. Diamond, *Abortion Politics, the Hawaiian Experience*, The Univ. Press of Hawaii, Honolulú, 1977, *passim*. A partir de *Wade*, las leyes de catorce estados fueron declaradas inconstitucionales dentro de un año o poco más y las de dieciséis fueron reformadas. Kenagy & Parkinson, *Abortion in the States*, Office of the Legislative Counsel, Oregon, mimeo., s.f., 2 págs. Puerto Rico pertenece a la minoría de jurisdicciones donde aún no se ha actuado conforme a la decisión de *Wade*.

Nos hemos referido principalmente hasta ahora al cuadro jurídico general y a algunos aspectos culturales del problema. Nos queda por emprender el análisis de algunas realidades subyacentes.

Estudios realizados sobre la fertilidad y el aborto demuestran que en las ciudades latinoamericanas el número de abortos guarda compás con el número de nacimientos. A mayor fertilidad, más abortòs. Requena, *Abortion in Latin America*, en R. E. Hall, ed., *Abortion in a Changing World*, Columbia Univ. Press, N.Y., 1970, Vol. 1, pág. 341. Las mujeres latinoamericanas que pertenecen a los estratos socioeconómicos y educativos inferiores tienen, no obstante, un índice de natalidad alto y pocos abortos. *Ibid.*, pág. 343. Cuando se divulga el conocimiento necesario para la adecuada planificación familiar la frecuencia del aborto aumenta en la América Latina. J. van der Tak, *Abortion, Fertility, and Changing Legislation: An International Review*, D. C. Heath & Co., Lexington, Mass., 1974, pág. 105. Los especialistas latinoamericanos estiman que por lo menos la mitad de todos los embarazos en la América Latina se interrumpen a causa de aborto ilegal y que mueren cuatro veces más mujeres jóvenes en esta región que en los países donde se permite el aborto. Dourlen-Rollier, *op. cit.*, pág. 121.

Existe prueba general que en las diversas regiones del mundo las mujeres jóvenes y solteras están recurriendo cada vez más al aborto. J. van der Tak, *supra*, pág. 106. Las cifras

disponibles para la población general de Estados Unidos y Puerto Rico son impresionantes. En 1974 se provocaron en Estados Unidos 745,000 abortos de conformidad con la ley, después de la decisión en *Wade*, pero hubo de 500,000 a 1,000,000 de mujeres que deseaban abortar y no pudieron obtener los servicios necesarios. The Alan Guttmacher Institute, *Provisional Estimates of Abortion Needs and Services in the Year Following the 1973 Supreme Court Decisions*, N.Y., 1975, págs. 7 y 9. El 60 por ciento de las mujeres que necesitaban estos servicios y no pudieron lograrlos vivía en las zonas más pobres. *Ibid.*, pág. 7. Un estudio de 1948–49 revela que en Puerto Rico ocurrieron 9.3 abortos por cada cien nacimientos (los natimuertos incluso) o 10.5 abortos por cada cien infantes que nacieron vivos. Para 1965 los abortos montaban al 12.8 por ciento de todos los partos de las mujeres entre los 20 y los 49 años de edad, a pesar de que para esa fecha más de una tercera parte de las mujeres puertorriqueñas había sido esterilizada. H. B. Presser, *Sterilization and Fertility Decline in Puerto Rico*, Greenwood Press, Westport, Conn., 1976, págs. 80, 103 *et seq.*

Del otro lado, no es evidente que las leyes que prohíben o restringen el aborto constituyen una barrera a su práctica. M. Potts, P. Diggory & J. Peel, *Abortion*, Cambridge Univ. Press, Londres, 1977, pág. 525; J. van der Tak, *op. cit.*, pág. 105; J. Chalala Aguilera, *Natalidad, Mortalidad, Maternidad y Aborto*, Instituto de Ciencias Médicas y Educacionales, La Habana, 1937, pág. 82; Dourlen-Rollier, *op. cit.*, págs. 121–22. El caso de Puerto Rico es un ejemplo clásico. En los seis años siguientes a la aprobación de la Ley Núm. 65 de 19 de junio de 1964, 24 L.P.R.A. secs. 231–35, que requiere la notificación compulsoria al Departamento de Salud de todo aborto que tenga lugar en Puerto Rico, no se informó un solo caso. 24 *Diario de Sesiones de la Asamblea Legislativa*, parte III, 1970, pág. 1218. Hace veinticinco años se presentaron en el Tribunal Superior seis casos por el delito de aborto. *Informe Anual del Director Administrativo de los Tribunales*, 1953–

54, tabla 4. El año pasado esta cifra se redujo a cuatro. Resulta claro que la punición del aborto en Puerto Rico por las leyes no tiene efecto disuasivo.

Los esfuerzos para reglamentar la práctica del aborto en Puerto Rico de modo más realista han resultado infructuosos. Véanse el P. de la C. 527 de 20 de enero de 1970 y el P. de la C. 415 de 8 de marzo de 1973. En este último, el entonces representante y hoy juez, Hon. David Urbina, intentó enmendar la legislación sobre el aborto para ajustarla a la decisión en *Wade*. La Asamblea Legislativa no actuó.

Así como la prohibición o la restricción severa del aborto no parece surtir gran efecto sobre su frecuencia, no hay indicio de que su legalización o liberalización dentro de determinados límites cause su aumento. Se sospecha que lo que sucede en estos casos es que se altera en parte la naturaleza clandestina del aborto. J. van der Tak, *Abortion, Fertility, and Changing Legislation: An International Review*, D. C. Heath & Co., Lexington, Mass., 1974, pág. 105, y reduce el número de muertes de las mujeres condenadas al aborto clandestino. En el estado de Nueva York, por ejemplo, donde no se limita el aborto al extremo que se restringe en Puerto Rico, las muertes se redujeron a dos por cada cien mil abortos. Donde florece el aborto clandestino la mortalidad promedio fluctúa entre cincuenta y cien fallecimientos por cada cien mil abortos. Dourlen-Rollier, *op. cit.*, pág. 125.

Aun así, la brecha existente entre el derecho y la realidad en este campo es extremadamente peligrosa. El aborto representa una carga particularmente pesada para las capas pobres de una sociedad. J. Chalala Aguilera, *op. cit.*, págs. 113–14. Es la mujer desvalida, la de educación escasa y recursos exiguos, la que sufre especialmente las consecuencias de no obtener servicios médicos adecuados. La conclusión más importante del estudio sociojurídico de *Wade* y otros casos estadounidenses sobre el aborto es precisamente la revelación de la extraordinaria necesidad de esos servicios. The Alan Guttmacher Institute, *Provisional Estimates of*

*Abortion Needs and Services in the Year Following the 1973 Supreme Court Decisions,* N.Y., 1975, págs. 10-12.

En el caso de Puerto Rico existe el factor adicional que la sobrepoblación se cuenta entre los males que más severamente azotan la economía de este pueblo. Para 1978 la densidad poblacional se elevó a unos 981 habitantes por milla cuadrada, entre las más altas del mundo. La tasa de crecimiento natural de la población aún se mantiene a niveles altos. El cuadro empeora al examinar la variable más significativa en el desarrollo demográfico de Puerto Rico, la migración. Durante la década presente y hasta el año pasado la corriente migratoria se invirtió, es decir, en vez de un movimiento emigratorio neto hemos tenido uno inmigratorio. *Informe Económico al Gobernador,* 1978, pág. 252 *et seq.*

V. *Conclusiones a la luz de la Constitución de Estados Unidos*

Las realidades socioculturales puertorriqueñas refuerzan, en vez de impedir, la aplicación de *Wade* y *Bolton* a Puerto Rico en lo que respecta al contenido mínimo del derecho a la intimidad. El Estado carece en consecuencia de poder para reglamentar el aborto hasta, por lo menos, el final del primer trimestre de embarazo aproximadamente. El Tribunal Supremo de Puerto Rico puede impartirle un sentido más amplio a la protección de la intimidad, en su función de intérprete del Art. II, Sec. 8 de la Constitución del Estado Libre Asociado, pero no menor que el dispuesto por el Tribunal Supremo de Estados Unidos. Bajo la Constitución de Estados Unidos, las únicas excepciones permisibles son las enunciadas en *Wade* y *Danforth.* Esto causa de por sí la inconstitucionalidad de los textos mencionados. El Ministerio Fiscal arguye, no obstante, que por tratarse aquí de una menor era necesario obtener el consentimiento de sus padres antes de provocar el aborto. Este argumento adolece de serias fallas. Nuestra legislación no requiere tal asentimiento, por lo que su ausencia no puede dar lugar a la comisión de un acto criminoso. *Nulla poena sine lege.* En segundo término, el Tribunal Supremo de Estados

Unidos ha resuelto que las asambleas legislativas estatales no les pueden conceder a los padres de una mujer un veto absoluto sobre la decisión de abortar. *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52, 74 (1976). Una menor puede aun prescindir totalmente del consentimiento de sus padres, de cumplir el estatuto ciertas normas a satisfacerse antes del acto del aborto. *Bellotti* v. *Baird*, 444 U.S. 887 (1979). *Danforth* y *Bellotti* se apoyan en la misma base constitucional de *Wade*.

VI. *Conclusiones a la luz de la Constitución de Puerto Rico*

La opinión de la mayoría no discute en absoluto la validez de nuestra legislación sobre el aborto al amparo de la Constitución de Puerto Rico.

El derecho a la intimidad tiene raíces distintas en la Constitución de Puerto Rico a las que posee en la Constitución de Estados Unidos. Tal derecho se reconoce expresamente en la Sec. 8 del Art. II de la Constitución de Puerto Rico. En la Constitución de Estados Unidos se deriva de otras disposiciones. El historial de ambas disposiciones es distinto. Su contenido puede serlo también. El derecho a la intimidad que reconoce la Constitución de Puerto Rico deriva de textos internacionales muy amplios. *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 439–441 (1975). Para declarar constitucionales los artículos aquí envueltos no basta con invocar la Constitución de Estados Unidos. Hay que analizarlos también a la luz de la Constitución de Puerto Rico. A la inversa, si se resuelve que una disposición aplicable a Puerto Rico no es válida por violar la Constitución de Estados Unidos, tampoco lo es una disposición análoga de la Constitución de Puerto Rico hasta donde represente, como hemos indicado antes, el contenido mínimo de un derecho fundamental.

No es necesario aquí en consecuencia discutir separadamente en gran detalle la razón por la cual el Art. 266 del Código Penal de 1937 es totalmente nulo y los Arts. 1 y 2 de la

Ley Núm. 136 de 15 de mayo de 1937 lo son parcialmente. [13] Lo son porque el contenido mínimo del derecho a la intimidad que reconoce la Constitución de Puerto Rico se describe en *Wade* y las disposiciones citadas ignoran la norma allí descrita. Aun de no existir *Wade* y su progenie, tales disposiciones serían nulas bajo la Constitución de Puerto Rico. Según señala Tribe, la verdadera cuestión que presentan estos casos es a quién se le reconoce el derecho a resolver si se tiene o no a un hijo, ¿a la mujer o al Estado? Tribe, *The Supreme Court 1972 Term—Foreword: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv. L. Rev. 1, 10 *et seq.* (1973). Estimamos que si el derecho a la intimidad ha de significar algo, es a la mujer a quien le corresponde la decisión, sin intervención estatal sustantiva u obstaculización velada, por un período no menor de tres meses, dependiendo de los hechos específicos de cada caso.

Bajo la Constitución de Puerto Rico consideramos que es constitucional, en su aplicación al pleito presente, la parte del Art. 1 de la Ley Núm. 136 que requiere que el aborto se practique por indicación de un médico debidamente autorizado a ejercer la medicina en Puerto Rico. Valga recordar, no obstante, que el derecho constitucional no opera en el vacío. Se nutre y depende de las realidades de la sociedad a que sirve. Cuando los derechos constitucionales habitan tan solo el mundo de la retórica o viven en precario, dependientes de otras circunstancias para alcanzar vigencia real, no basta con que los tribunales los declaren simplemente. Hay que velar también porque su reconocimiento traspase los linderos de la mera semántica. De nada vale proclamar solemnemente que sólo se permite el aborto tras intervención médica si no hay médicos disponibles, información para requerirlos o dinero con qué pagarlos. En tales circunstancias la imposición de tal requisito equivale en efecto a la prohibición del aborto. La Constitución no admite subterfugios.

[13] No está ante nuestra consideración la validez o nulidad del Art. 266 del Código Penal de 1937 ni de las disposiciones restantes de la Ley Núm. 136 de 15 de mayo de 1937, ni las de la Ley Núm. 65 de 19 de junio de 1964.

En el caso presente no están envueltas estas últimas consideraciones. Intervino un médico debidamente autorizado a ejercer la medicina en Puerto Rico. Este requisito no constituyó un obstáculo de la severidad necesaria para equivaler a una negación del derecho a la intimidad de la mujer en este caso. En tales circunstancias el requisito es válido. Existe un nexo racional entre el derecho a la intimidad y su ejercicio en condiciones óptimas para la interesada. Ya que intervino en este caso un médico, según exige la disposición discutida, sin que quedase él por cumplir con otra exigencia válida, procede claramente la absolución del facultativo apelante.

Deseamos expresar, por último, que estamos conscientes de los tormentosos conflictos de opinión que genera este delicado asunto en muchas sociedades. La función de este Tribunal se limita a señalar lo que el derecho exige. Los dictámenes de este Tribunal no pueden irrumpir en las convicciones religiosas o de otro género de cualquier ser humano. El aborto es permisible en Puerto Rico, como cuestión de ley, en las circunstancias indicadas, pero esto no afecta, ni puede afectar, las sanciones eclesiásticas prevalecientes o que se impongan por las diferentes iglesias del país.

Por las razones expuestas, resolvería que el Art. 266 del Código Penal de 1937, 33 L.P.R.A. sec. 1053, y la parte del Art. 2 de la Ley Núm. 136 de 15 de mayo de 1937, 33 L.P.R.A. sec. 1052, análogas a las disposiciones anuladas del Art. 1 de tal ley, son inconstitucionales, así como la palabra "terapéutico" y la frase del Art. 1 que expresa "con vista a la conservación de la salud o la vida". Absolvería por tanto al apelante.

—O—

Opinión particular disidente en parte del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 17 de abril de 1980

Me uno a la disidencia del Juez Presidente predicada

sobre la vigencia en Puerto Rico del dictamen del Tribunal Supremo federal en materia de aborto. Mi razón de conciencia hubiese sostenido la legislación puertorriqueña (¹) sobre aborto que permite intervención con el misterio de la vida únicamente cuando haya un riesgo para la salud de la madre, mas la doctrina constitucional que nos obliga anula y desplaza la ley local.

No puede afirmarse que los Arts. 266 y 91 del Código Penal de 1937 y 1974 y la Ley Núm. 136 de 15 mayo de 1937 guardan alguna armonía con la citada jurisprudencia norteamericana. La disposición central de nuestro estatuto prohibiendo el aborto "excepto el caso de que fuere necesario para salvar [la vida de la mujer]" (Art. 266, Código Penal de 1937); o "salvo indicación terapéutica hecha por médico . . . con vista a la conservación de la salud o vida" [Ley Núm. 136 de 15 mayo, 1937 (33 L.P.R.A. sec. 1051)] y Art. 91, Código Penal de 1974 (33 L.P.R.A. sec. 4010) coincide con el texto de la Ley de Georgia: "26-1202. Exception. (a) Sec. 26-1201 [definition of crime] shall not apply to an abortion performed by a physician duly licensed to practice medicine and surgery pursuant to Chapter 84-9 or 84-12 of the Code of Georgia of 1933, as amended, based upon his best clinical judgment that an abortion is necessary because: (1) A continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health; . . ." anulada en *Doe* v. *Bolton*, 410 U.S. 179, 202 (1973), al sostenerse que en el primer trimestre del embarazo prevalece intocable e incuestionable la decisión de la mujer sobre terminación al mismo, y que su libre albedrío no puede

(¹) El derecho de libertad íntima nace del recóndito fondo moral, emotivo y tradicional del pueblo, parte esencial de su idiosincrasia y crisol de su personalidad. El punto hasta el que pueda llegar una persona en ejercicio de su libérrima voluntad sin contravenir las reglas y leyes en las cuales la sociedad a que pertenece ha enmarcado sus propios e inmanentes principios de moral y de orden público, es cuestión a definirse localmente. "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas or New York City." *Miller* v. *California*, 413 U.S. 15, 32 (1973).

sujetarse a condición alguna, aunque esa condición sea la previa determinación médica (²) de que el aborto es necesario para preservar la salud o la vida de la madre. El lenguaje del Tribunal Supremo federal es enfático: ". . . 'For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician' without interference from the State." *Roe* v. *Wade*, 410 U.S. 113, 164 (1973), ratificado en *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52, 61 (1976).

Al resolver que el interés legítimo del Estado en la salud de la madre no alcanza el punto de intervención obligada (*compelling point*) hasta que haya transcurrido el primer trimestre, expresó el Tribunal Supremo federal: "This means, on the other hand, that, for the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State. With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Roe* v. *Wade*, supra, pág. 163.

No cabe, por tanto, sostener la constitucionalidad de nuestra legislación y de paso atribuirle una laxitud y permisibilidad extraña por completo a su contenido moral y al concepto de derecho de libertad íntima que en ella vertió

---

(²) En el caso que hoy nos ocupa no hay constancia en récord de que dicha determinación precediera a la práctica del aborto.

nuestra Asamblea Legislativa autorizando el aborto en toda etapa única y exclusivamente cuando lo exigiere la preservación de la vida o salud de la mujer. Nuestra ley permite el aborto por excepción: "excepto el caso de que fuere necesario para salvar su vida"; "salvo indicación terapéutica . . . con vista a la conservación de la salud o vida". Por el contrario, el concepto de excepción ha sido desterrado de la doctrina constitucional que prevalece. Repudia todo elemento de permiso del Estado o consentimiento de terceras personas y eleva la decisión de la mujer para terminar el embarazo en esos primeros noventa días a derecho fundamental, parte y sustancia de su derecho de libertad íntima ante el cual cede hasta el interés del Estado en conservar la integridad de la familia. Ha dicho el Tribunal Supremo federal: "Moreover, we recognize that the decision whether to undergo or to forgo an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious. Notwithstanding these factors, we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy when the State itself lacks that right." *Planned Parenthood of Central Missouri,* supra, a la pág. 70.

He preferido citar al Tribunal Supremo federal en su propio lenguaje para demostrar que habiéndose anulado en *Doe* v. *Bolton* y *Roe* v. *Wade* un estatuto similar al nuestro, incide quien lee la jurisprudencia norteamericana como expresión reconciliable con nuestra legislación sobre la materia.

—O—

Opinión concurrente en parte y disidente en parte del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 17 de abril de 1980

Me uno al criterio mayoritario de este Tribunal en cuanto

a que la Sec. 1 de la Ley Núm. 136 de 15 de mayo de 1937, 33 L.P.R.A. 1051, y el Art. 91 del Código Penal de 1974, 33 L.P.R.A. 4010, ([1]) que adoptó la definición dada por aquélla al delito de aborto, son constitucionalmente válidas. Disiento, sin embargo, de que se concluya que el apelante no cometió dicho delito. A mi juicio su convicción debería confirmarse.

Nada hay que añadir a la bien fundamentada opinión del Tribunal para concluir, como allí se hace, que nuestro estatuto sobre el aborto supera la prueba de la trilogía que forman los casos de *United States* v. *Vuitch*, 402 U.S. 62 (1971), *Roe* v. *Wade*, 410 U.S. 113 (1973), y *Doe* v. *Bolton*, 410 U.S. 179 (1973). Podríamos resumir la doctrina del más alto Tribunal federal, que estamos obligados a acatar, y en cuanto aplica a los hechos ante nuestra consideración, como sigue: un estatuto que prohíbe el aborto es válido, si por excepción lo permite en el caso de una mujer con un embarazo que no exceda de tres meses ([2]) y "el médico que la atiende", "en consulta con su paciente", determina a base de "su juicio médico" que es necesario desde el punto de vista terapéutico, es decir, para proteger su salud física o mental. ([3])

---

([1]) La Sec. 1 de la Ley Núm. 136 de 15 de mayo de 1937, 33 L.P.R.A. sec. 1051, cuya infracción se imputó al apelante, disponía:

"Por la presente se prohíbe, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico *con vista a la conservación de la salud o vida*, el indicar, aconsejar o inducir a abortar o practicar el aborto en una mujer embarazada." (Énfasis suplido.)

Y el Art. 91 del Código Penal de 1974, 33 L.P.R.A. sec. 4010, dispone:

"Toda persona que permita, indique, aconseje, induzca o practique un aborto, toda persona que proporcionare, facilitare, administrare, prescribiere o hiciere tomar a una mujer embarazada cualquier medicina, droga, o sustancia o que utilizare o empleare cualquier instrumento u otro medio con intención de hacerla abortar, y toda persona que ayudare a la comisión de cualquiera de dichos actos, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico, con *vista a la conservación de la salud o vida de la madre*, será sancionada con pena de reclusión por un término mínimo de dos años y máximo de cinco años." (Énfasis suplido.)

([2]) No nos interesa para los fines del caso ante nos, por tratarse de un aborto en el primer trimestre de embarazo, la distinción que se hace en *Roe* v. *Wade* respecto a embarazos de más de tres meses.

([3]) "This means, on the other hand, that, for the period of pregnancy prior to this 'compelling' point, *the attending physician, in consultation with his patient,* is free to

A la luz de esa doctrina y del estatuto sobre aborto, veamos cuáles fueron los hechos que tuvo el jurado ante su consideración y a base de los cuales concluyó más allá de duda razonable que el aquí apelante es culpable. Se basan dichos hechos en los testimonios de Wanda Ivette, de su señora madre, del señor Luis Raúl Rodríguez Isern, y del Dr. César Berríos, este último presentado por el apelante.

Para el 24 de julio de 1973 Wanda Ivette contaba diez y seis años de edad. Los había cumplido el 30 de marzo. Hacía año y medio—probablemente desde que tenía catorce años— era novia de Tito, de quien quedó embarazada para el mes de mayo de 1973, cuando tuvo su última menstruación. No dijo nada a su madre, con quien vivía en Caguas. Ella y su padre se habían divorciado y él vivía en Estados Unidos.

Wanda le dijo a Tito que estaba encinta. Ella no hizo más gestiones y el 23 de julio de 1973 el señor Luis Rául Rodríguez Isern, de Caguas, padre de Tito, acompañado de otro hijo suyo también llamado Luis, decidió, sin consultar a la madre de Wanda, llevarla a Juncos donde el apelante, Dr. Pablo Duarte Mendoza. Llegaron al dispensario de dicho médico. El señor Rodríguez Isern entró, quedando Wanda afuera. Al rato salió el señor Rodríguez Isern y Wanda fue conducida donde el doctor. Éste, sin más, la examinó y le dijo que tenía tres meses de embarazo. Luego indicó al señor Rodríguez Isern que cobraba $300.00, a razón de $100.00 por cada mes.

Se dispuso que Wanda regresara al día siguiente, como así se hizo, esta vez llevada donde el apelante por Luis, el hijo del señor Rodríguez Isern, quien entregó $300.00 en efectivo a la enfermera Gladys E. López, empleada del apelante. (4) Ésta condujo a Wanda al interior del local, le puso una inyección, y

determine, without regulation by the State, that, *in his medical judgment* the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State." *Roe* v. *Wade*, supra, pág. 163.

(4) Dicha enfermera fue acusada conjuntamente con el Dr. Duarte Mendoza por el delito de aborto, y convicta por el jurado. Apeló por separado pero por falta de jurisdicción se desestimó su recurso, quedando en pie su convicción y la consiguiente sentencia.

luego el apelante le dilató la vagina y, mediante el uso de determinados instrumentos, perpetró el aborto.

Desde entonces Wanda desarrolló dolores en el vientre y comenzó a sangrar. Le dio fiebre, mareos, vómitos y dolor de cabeza. Continuó sintiéndose mal y relató lo ocurrido a una prima suya, quien la llevó a la semana donde el Dr. César Berríos, médico ginecólogo en el Hoffa Medical Center. Utilizó para ello una tarjeta de plan médico de una hija de su padrastro. El Dr. Berríos la trató, pero ella continuó sintiéndose mal, teniendo que ser sometida a más tratamiento por diferentes médicos en el Hospital Subregional de Caguas.

La acusación fiscal a base de la cual fue convicto el apelante le imputó que el 24 de julio de 1973, actuando en concierto y común acuerdo con Gladys E. López, practicó el aborto a Wanda Ivette "sin serlo por indicación terapéutica hecha por un médico autorizado con vista a la conservación de la salud o vida".

La prueba estableció cumplidamente dichas alegaciones. Es cierto que no hubo prueba directa de que el apelante practicara el aborto sin hacer una determinación de que éste era necesario por razones terapéuticas para proteger la salud de Wanda. Pero la prueba circunstancial permite que se haga la inferencia, más allá de duda razonable, que no hubo juicio clínico alguno. Wanda no conocía al apelante y mucho menos era paciente suya. Nunca hubo relación de médico y paciente entre ellos. Era una niña de diez y seis años y el apelante no tuvo ni siquiera el escrúpulo de preguntarle si tenía padre o una madre que la acompañara y la hubiera aconsejado. No consultó con ella lo que se proponía hacer. Le bastó el requerimiento del señor Rodríguez Isern, quien no tenía nexo familiar alguno con ella ni poder sobre ella para tomar una decisión que sólo a ella personalmente competía. ¿No era su propia "salud" y no la de Wanda la que preocupaba a don Luis? Le bastó al médico que este señor estuviera dispuesto a pagar en efectivo los $300.00 que cobraba, a $100.00 por mes de embarazo. Obviamente fue don Luis Rodríguez Isern

quien hizo el juicio clínico que los casos de *Wade* y *Bolton* reservan al médico. El aborto practicado en este caso no es la clase de tratamiento médico quirúrgico que las citadas disposiciones de nuestras leyes admiten como excepción para que no se incurra en delito.

La edad de Wanda Ivette era sin duda un factor que el médico tenía que considerar. ¿Tenía esta niña de diez y seis años la madurez suficiente para tomar una decisión tan trascendental como era extirparse de sus entrañas a un ser que ya existía? Nuestras leyes no reconocen en una persona de esa edad la capacidad para consentir en ser adoptada, sin el consentimiento de sus padres o de su tutor. (5) No reconocen a una mujer de esa edad la capacidad para contraer matrimonio sin el consentimiento de quien tenga sobre ella la patria potestad. (6) No reconocen a una persona de esa edad la capacidad para disponer de sus bienes, requiriéndose autorización judicial para ello. (7) No le reconocen la capacidad para cometer delito. (8) Tampoco se le reconoce a una persona de diez y seis años la capacidad para ejercer el derecho al voto en los procesos democráticos en nuestro país. (9)

Frente a esas prerrogativas y actos la ley no reconoce suficiente capacidad o capacidad alguna a una niña de diez y seis años. ¿La tiene, sin embargo, para decidir sobre la existencia de un ser que ya late en sus entrañas? No puedo aventurar un juicio para todos los casos. Pero ciertamente no puedo estar de acuerdo con renunciar a nombre de la ley y a favor de cualquier médico—un médico de ocasión como en este caso—el reconocimiento de tal capacidad. Este médico no entrevistó a la niña. Nada hay en los autos en qué basar la determinación que no hizo, pero que parece inferir este

---

(5) Art. 135 del Código Civil, 31 L.P.R.A. sec. 536.

(6) Art. 70 del Código Civil, 31 L.P.R.A. sec. 232, en su inciso 4.

(7) Art. 150 del Código Civil, 31 L.P.R.A. sec. 616; *Santos Green* v. *Cruz*, 100 D.P.R. 9 (1971); *Zayas* v. *Rexach Const. Co., Inc.*, 103 D.P.R. 190 (1974).

(8) Véanse las disposiciones sobre procedimientos judiciales en relación con menores, 34 L.P.R.A. sec. 2001 y ss.

(9) Ley Núm. 4 de 20 de diciembre de 1977, 16 L.P.R.A. sec. 3053.

Tribunal que hizo, de que tenía capacidad para consentir al aborto. Nada hay en los autos que permita inferir que este médico ejerció su juicio médico. No podemos ser tan cándidos como para creer lo que nadie más creería. *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

La decisión que hoy toma este Tribunal de considerar válidas las disposiciones de ley que prohíben el aborto y al mismo tiempo fallar que no las infringió el aquí apelante ha de sentar un precedente funesto para la práctica de la medicina en Puerto Rico.

Confirmaría la sentencia apelada.